# In the United States Court of Federal Claims

No. 09-465C
(Filed: December 23, 2009)*
*OPINION ORIGINALLY FILED UNDER SEAL ON DECEMBER 14, 2009

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| GCC ENTERPRISES, INC., | * |
| Plaintiff, | * Bid Protest; SDVOSB Set-Aside; |
| | * Multiple Solicitations Under Single |
| v. | * Source Selection Authority; Pre- |
| | * Award Re-Evaluation; Failure to |
| THE UNITED STATES, | * Show Abuse of Discretion |
| Defendant, | * |
| IRONCLAD SERVICES, INC., | * |
| Defendant-Intervenor. | * |
| * * * * * * * * * * * * * * * * * * | * |

*Michael H. Payne,* Philadelphia, PA, for plaintiff. *Joseph A. Hackenbracht,* and *Craig A Schroeder,* Philadelphia, PA, of counsel.

*David M. Hibey,* U.S. Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and Director *Jeanne E. Davidson*, for defendant. *L. Misha Preheim*, Washington, DC, of counsel.

*Kevin M. Cox*, Auburn, NY, for defendant-intervenor.

**O P I N I O N**

**FIRESTONE**, *Judge*.

1

Pending before the court are cross-motions for judgment on the administrative record filed under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") by the plaintiff, GCC Enterprises, Inc. ("GCC"), and by the defendant, the United States ("government"), in this bid-protest case.[1]  For the reasons set forth below, the court **GRANTS** the government's motion for judgment on the administrative record and **DENIES** the plaintiff's motion for judgment on the administrative record.

I.   **STATEMENT OF FACTS**

The following facts are taken from the administrative record and are not in dispute.

**A.   Solicitation**

On October 31, 2008, the United States Army Corps of Engineers ("COE"), Omaha District issued seven solicitations to provide emergency temporary roof repairs in support of disaster response for several states.  Administrative Record ("AR") 90.  Among the largest of these solicitations was solicitation No. W9128F-09-R-0010 ("RFP"), the solicitation at issue here, which is commonly referred to as the "All State" or "All States" solicitation.  This solicitation called for the provision of emergency temporary roof repairs using blue plastic sheeting ("blue roofs") in support of disaster

---

[1] Also pending before the court is the motion of the intervenor, Ironclad Services, Inc., for leave to supplement the administrative record.  For the reasons set forth in this opinion, the court finds that the agency's decision is supported by the administrative record and that supplementation of the record is not necessary under the standards articulated in Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009).  It is not necessary to consider additional facts not included in the record that may provide additional bases for rejecting GCC's proposal.  The intervenor's motion is therefore **DENIED-AS-MOOT**.

response for nineteen coastal states plus the District of Columbia.  Id.  Under the terms of the solicitation, COE intended to award one Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract (known as a Single Award Task Order Contract) in an amount not to exceed $50,000,000, with a minimum guarantee of $5,000.  AR 90, 111.  The period of performance for this contract consisted of a three-year base period and a two-year option period for a total of a five-year performance period.  AR 147.  The procurement was set aside for Service Disabled Veteran Owned Small Businesses, AR 95, and provided that the offeror was required to self-perform 30% of the work under the contract.  AR 145.  The six other concurrent solicitations also concerned installation of blue roofs for regions of the country or individual states.  Proposals for the seven solicitations were evaluated by seven different Source Selection Evaluation Boards ("SSEB" or "Board").  However, the final award decision was to be made by a single Source Selection Authority ("SSA").

The All State solicitation was advertised on October 31, 2008, and twenty-three proposals were received on or before December 11, 2008.  AR 1298.  GCC and the intervenor, Ironclad Services, Inc. ("Ironclad"), were among the offerors who submitted proposals.

     **B.**    **Evaluation of Proposals**

The All State proposals were evaluated by the All State SSEB, which was established in accordance with the Source Selection Evaluation Plan ("SSEP").  The SSEB consisted of three voting members and a non-voting chairman; it convened from

February 23 to February 27, 2009, evaluating twenty-two proposals in accordance with the SSEP.[2] AR 1058-59. According to the solicitation, "[t]he principal objective of the evaluation process is to make award of a contract to the responsible offeror whose proposal is determined to be the 'best value' to the Government, price and other factors considered in a Service Disabled Veteran Owned (SDVO) Small Business set aside." AR 121. The evaluators considered two volumes. Volume I contained the Technical Proposal, and Volume II consisted of the Cost/Price Proposal. Id. The Technical Proposal was divided into five factors and was considered <u>significantly more important</u> than the Cost/Price Proposal. Id. The following table contained in the solicitation details these factors and the weight that the SSEB was to afford to each proposal evaluated:

| **TECHNICAL FACTORS** | **RELATIVE IMPORTANCE** |
|---|---|
| **Volume I – Technical Proposal** | **Significantly more important than Cost/Price Proposal** |
| A.  Mobilization/Strategic Management Plan | Significantly more important than B, C, D, and E |
| B.  Experience, Personnel and Specialized Expertise | Equally important to C<br>Slightly more important than D and E<br>Significantly less important than A |
| C.  Capacity | Equally important to B<br>Slightly more important than D and E |

---

[2]Although twenty-three proposals were submitted, one proposal was not evaluated because it contained a material defect arising out of a falsified rating provided by the offeror. AR 1298.

4

|   |   |   |
|---|---|---|
|   |   | Significantly less important than A |
| D. | Past Performance | Significantly less important than A<br>Slightly less important than B & C<br>Slightly more important than E |
| E. | Subcontracting | Significantly less important than A<br>Slightly less important than B, C, and D |
| **Volume II – Cost/Price Proposal** | | **Significantly less important than Technical Proposal** |
| F. Cost/Price | | Significantly less important than A-E |

AR 121-122 (emphasis in original).

Section A, "Mobilization/Strategic Management Plan," measured five subsections: (1) "Deployment Plan--Mobilizing to Meet The Mission"; (2) "Organizational & Managerial Structure to Support Rapid and/or Long Term Deployment"; (3) "Structure of Proposed Team"; (4) "Safety Program"; and (5) "Quality Assurance / Quality Control Program." AR 123-24. The first sentence of the evaluation section concerning Section A states, "Offerors should demonstrate a mobilization plan that includes the numbers, disciplines, and level of expertise of each employee that they may deploy." AR 123. Section B, "Experience, Personnel and Specialized Expertise," measured six subsections: (1) "Resumes of Key Personnel"; (2) "Expertise in Disaster Response"; (3) "Expertise in Temporary Roofing or Roofing Missions"; (4) "Best Practices Proposal to Minimize Damage to Metal Roofs"; (5) "Best Practices Proposal to Repair Small Areas of Damage on Roofs"; and (6) "Best Practices To Develop/ Maintain An Electronic Database

Tracking and Scheduling Assigned Work." AR 124-26. Section C, "Capacity," measured one factor: "Ability to Respond to a Disaster of Varying Magnitude & Execute." AR 126. Section D, "Past Performance," measured an offeror's past performance, and Factor E, "Subcontracting," measured factors related to an offeror's "Subcontracting With Local Entities." AR 126.

For each proposal, the individual members of the Board assigned adjectival ratings for each section considered. Those individual ratings were then tabulated to create a consensus rating. For proposal Sections A, B, C, and E, the ratings available were Excellent, Above Average, Average, Marginal, and Unsatisfactory.[3] AR 122. For

---

[3]The solicitation provided the following descriptions for each rating:

4.1.1. Excellent: Proposal demonstrates an excellent understanding of requirements and offeror's proposal shows that they have significantly exceeded performance or capability standards. Proposal has exceptional strengths that will significantly benefit the Government. Proposal represents very low risk that the offeror's performance of any work requirements will impact schedule, cost, or performance.

4.1.2. Above Average: Proposal demonstrates a good understanding of requirements and offeror's proposal shows that they have exceeded performance or capability standards. Proposal has two or more strengths that will benefit the Government. Proposal represents low risk that the offeror's performance of any work requirements will impact schedule, cost, or performance.

4.1.3. Average: Proposal demonstrates acceptable understanding of the requirements and offeror's proposal meets performance or capability standards. Proposal demonstrates one (1) strength that will benefit the Government. Proposal represents moderate risk that the offeror's performance of any work requirements will impact schedule, cost, or performance.

4.1.4. Marginal: Proposal demonstrates shallow understanding of requirements and offeror's proposal only marginally meets performance or capability standards for minimal but acceptable contract performance. Proposal has no strengths that will benefit the Government and may have weaknesses that are detrimental to the

Section D, which rated the amount of risk associated with a bid based upon the offeror's past performance, the possible ratings were Very Low Risk, Low Risk, Moderate Risk, High Risk, Very High Risk, and Neutral.  AR 122-23.

On or about February 27, 2009, the SSEB issued consensus ratings for twenty-two All State proposals.  *****

**C.     Re-evaluation**

Following the initial evaluation of the proposals by the All State and Florida Boards, Lee McCormick ("Mr. McCormick"), the SSA and contracting officer in the COE's Omaha District, decided that three proposals--GCC, RCG, and ACRO Construction LLC ("ACRO")--needed to be re-evaluated.  The SSA found that there was "a major discrepancy" between the All State and Florida Boards' treatment of common factors contained in the proposals.  AR 1294-95.  According to Mr. McCormick, the All State and Florida Boards appeared to evaluate differently common factors contained in the proposals concerning "the credit given to a subcontractor."  AR 1294.  Mr. McCormick determined that "some of the discrepancies are too far apart and it appears

---

Government.  Proposal represents high risk that the offeror's performance of any work requirements will impact schedule, cost, or performance.

4.1.5.  Unsatisfactory: Fails to meet performance or capability standards. Requirements can only be met with major changes to the proposal.  Proposal represents very high risk that the offeror's performance of any work requirements will impact schedule, cost, or performance.

AR 122.

the boards were not evaluating on the same criteria and assumptions." AR 1296. On April 2, 2009, Mr. McCormick notified [the] All State Board chairman ***** and [the] Florida Board chairman ***** that these three proposals needed to be re-evaluated by the respective Boards *****.

Mr. McCormick then instructed the Boards to "evaluate subcontractors['] qualifications and the prime contractor's ability to self-perform 30% of the work." AR 1296; see also AR 1294. Mr. McCormick focused the Boards' attention upon the "teaming agreements" set forth in the three re-evaluated bids:

> The RFP says that we will consider teaming arrangements. Consequently, a signed teaming arrangement means we can give credit to a proposal for the subcontractor's qualifications. The prime contractor still must perform 30% of contract[,] so we will evaluate the prime contractor's capabilities regardless.
> - If the prime cannot perform 30% without the subcontractor, there must be a significant weakness noted.
>
> . . . .
>
> - Not having been a prime contractor before does not mean the contractor cannot self-perform 30%. If a contractor has not been the prime contractor, but has relevant roofing experience or emergency response experience, the board should consider that, especially if they are furnishing some of the management personnel.
>
> . . . .
>
> - If there is a signed teaming arrangement and the prime contractor demonstrates ability to self perform 30% and function even without the subcontract teaming partner, the board may assign an [Excellent] rating.
> - If there is a subcontractor identified, but no teaming agreement was submitted or there is no history shown between the two firms, the board should not consider the subcontractor qualifications and evaluate and rate only the

prime's qualifications. Significant weaknesses should be noted if the proposal relies on the subcontractor's qualifications. A Marginal rating would be in order.

AR 1294.

The All State Board's re-evaluation process took place during April and May 2009. See AR 1379-1401. *****

### D. Final Source Selection

Following this re-evaluation, the SSA, Mr. McCormick, continued evaluating the twenty-two All State proposals submitted to the COE. Mr. McCormick removed eight proposals from consideration because those proposals had received "at least one Marginal or Unsatisfactory (i.e., significant weakness) rating in the three most important sections of the Technical proposal, Sections A, B, & C." AR 1300. Of the fourteen remaining proposals, twelve proposals were lower than the government estimate ***** and "contain[ed] no significant weaknesses that would require a proposal revision." Id.

From the remaining twelve proposals, Mr. McCormick next considered the three highest rated technical proposals, *****. Id. Because GCC's proposal was not among the top three, it was not included in this stage of the evaluation. ***** Mr. McCormick determined that Ironclad had "the best overall Technical proposal based on the strength of the [Excellent] rating in Section A, which is the most important factor in the Technical proposal." AR 1301. Mr. McCormick made this determination based upon the fact that "Ironclad was the only offeror after the re-evaluation to receive an [Excellent] rating in

9

Section A[4] and only offeror to receive a Very Low risk rating in Section D." Id.  *****

*****  In his trade-off analysis [between Ironclad and SDVA], Mr. McCormick noted that Ironclad was "evaluated more favorably than [the next best offeror with a lower overall price] in 3 of the 5 Technical factors and equally[] in one."  Id.  Mr. McCormick also noted that "SDVA appear[ed] to rely on subcontractors to [a] much greater extent than Ironclad."  Id.  Mr. McCormick observed that the contract contained "a 30% self-performance requirement, but Ironclad has a clear advantage in this regard and is determined to represent a lower risk of failure."  Id.  Mr. McCormick ultimately concluded: "Ironclad's superior Technical proposal, including the lowest evaluated risk, is determined to represent the best value."  Id.  Based on this best value determination, COE on June 4, 2009 awarded the ID/IQ All State contract to Ironclad.  AR 1302-03.

After receiving notice of this decision, GCC requested and received a debriefing from the SSA on July 31, 2009.  See AR 1375-76.  The debriefing concerned both the All State and Florida solicitations.  Although the COE did not rank all proposals, Mr. McCormick explained that GCC was rated "approximately fourth overall" for the All State solicitation.  AR 1377.  Mr. McCormick noted that GCC had the lowest price proposal and that Ironclad's proposal "had 10 proposals above [it] and 12 below in regards to price."  Id.  However, Mr. McCormick made clear that the "primary rationale" for awarding the contract to Ironclad was its superior rating in Technical Factor A,

---

[4]*****

Mobilization/Strategic Management Plan, a factor significantly more important than cost under the terms of the solicitation.  Id.

## II.     DISCUSSION

### A.     Scope and Standard Of Review

The pending motions are brought pursuant to RCFC 52.1, which provides for review based on the administrative record.  Under RCFC 52.1, the court determines whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

In reviewing an agency's procurement decision under RCFC 52.1, the court's role is limited.  Under the governing statute, 28 U.S.C. § 1491(b)(4), the court applies a standard of review adopted from the Administrative Procedure Act, codified at 5 U.S.C. § 706(2)(A) (2006).  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  This standard of review provides that a reviewing court shall set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. at 1332 n.5.  The Federal Circuit has explained this standard, stating that an agency's decision may be arbitrary and capricious where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc. -Birmingham v. United States, Nos. 2009-5021, 5022, 5023, 2009 WL 3818528, at *2 (Fed. Cir. Nov. 17, 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).  In applying this standard, the court must be mindful that it may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious.  Motor Vehicle Mfrs., 463 U.S. at 43; see also Ala. Aircraft, 2009 WL 3818528, at *3; AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009) ("This Court does not sit as a super source selection authority to second guess and re-score offerors' proposals.").

In addition, to prevail in an action such as this, a party must also establish that it has been prejudiced by the agency decision it is challenging.  To show prejudice, a party must demonstrate that "but for the error, it would have had a substantial chance of securing the contract."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

### B. The Decision To Re-Evaluate GCC's Proposal Was Not Arbitrary and Capricious in the Unique Circumstances of this Procurement

GCC contends that the agency's decision to re-evaluate its proposal was arbitrary and capricious and amounted to an abuse of discretion.  GCC argues first and foremost that the SSA abused his authority by ordering a re-evaluation of the All State ratings based on the information he had received regarding the Florida ratings.  GCC contends that the SSA had to confine his review of the All State ratings to the information

contained within the "four corners" of the All State proposals and could not look at outside information during his evaluation and selection process. A review of the record, however, reveals that under the terms of the SSEP in this case, the SSA was authorized to consider information outside the four corners of the proposals. Thus, the SSA's decision to re-evaluate certain proposals was not improper in this context. In addition, the court finds that the information that was considered by the SSA was proper.

To begin, the SSEP for the All State solicitation provides that "<u>any information that pertains to factors/sub-factors to be evaluated is germane and may be used in the evaluation process.</u>" AR 50 (emphasis added). The SSEP further provides that "[d]uring past performance evaluation, the Government reserves the right to look outside of the proposals for past performance information of the offeror. The Government will consider information submitted by the offeror, <u>as well as any other relevant and reliable information obtained from any other source</u>. . . ." AR 72-73 (emphasis added). Thus, in this case, by the terms of the solicitation, the SSA was authorized to consider relevant information from the Florida SSEB in considering the ratings by the All State SSEB. In this connection, the court notes that in similar circumstances involving multiple contracts for the same services, it is recognized that information related to concurrent proposals by the same offeror may be considered. See <u>Ashbritt</u>, 87 Fed. Cl. at 350-51 (acknowledging that where a solicitation imposed geographic limitations on the award of multiple contracts under one solicitation, the agency could look to offerors' concurrent proposals).

Given that the SSEP granted the SSA the authority to look at germane information outside the four corners of the proposal, the court does not find that he was arbitrary or capricious in considering the ratings of the Florida SSEB in his evaluation of the All State ratings. Certainly the information from the Florida SSEB was "germane" and "relevant" to the All State evaluation because it suggested that the All State SSEB could have been improperly applying the evaluation criteria. Given this provision in the SSEP and the wide discrepancy among the ratings, the SSA did not act arbitrarily or capriciously in ordering a re-evaluation. GCC's contention that the SSA impermissibly interjected himself into the decision making process is without merit. Under the SSEP, the SSA's duties included "[e]nsur[ing] that the evaluation of proposals is consistent with the SS[E]P and the requirements of the RFP" and "[p]rovid[ing] the SSEB with guidance and special instructions for conducting the evaluation and selection process." AR 46. The decision to order a re-evaluation under more clearly-explicated criteria was within the scope of these duties. Therefore, the decision to request the SSEBs to re-examine their ratings was not an abuse of discretion.[5]

---

[5]GCC argues that the existence of rating discrepancies does not by itself suggest that the ratings are wrong. The court agrees. See John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 822 (3d ed. 1998). Indeed, had the SSA decided not to order a re-evaluation, a reviewing court might have been hard pressed to order the ratings be re-evaluated. However, the issue here is whether the SSA abused his discretion when he required a re-evaluation of the proposals where the ratings were significantly different. The court finds that he had the authority to do so and that the decision does not amount to an abuse of discretion.

GCC's additional objections to the re-evaluation are also lacking in merit.[6]  GCC argues that the record indicates that the SSA intended for only the Florida proposals to be re-evaluated.  GCC's reading of the record is simply incorrect.  To support its contention, GCC points out that the SSA stated in an email that the "proposals from Florida below need to be re-evaluated."  AR 1294.  However, the rest of the email correspondence between the SSA and leaders of the SSEBs makes it clear that the SSA wanted both the All State and Florida SSEBs to re-evaluate certain proposals.  See AR 1294-96.  The April 2, 2009 email was sent to both the All State and Florida SSEB chairmen and states, "the following proposals need to be re-evaluated by the Florida SDV <u>and [A]ll [S]tate SDV boards</u> . . . ."  AR 1295 (emphasis added).  Thus, the All State SSEB was authorized to re-evaluate GCC's proposal to address the discrepancies noted by the SSA between the All State and Florida evaluations.

GCC also argues that the re-evaluation was not rational because it did not provide the SSEB with information on GCC's proposal for the Texas contract, which GCC received.  See AR 1376.  \*\*\*\*\*  The court has no basis for second-guessing the SSA's decision to have the SSEBs re-evaluate the proposals for All State and Florida only.

---

[6]GCC suggests in its briefs that the decision to re-evaluate GCC was aimed at eliminating GCC from the best value analysis.  The plaintiff does not allege bad faith on the part of the agency.  Accordingly, there is no basis for evaluating this contention.  See <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("when a bidder alleges bad faith, 'in order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable'" (quoting <u>Info. Tech. Applications Corp. v. United States</u>, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003))).

Based on the reasoning provided in the record, the discrepancies between the All State and Florida reports justified a re-evaluation. The court cannot substitute its judgment for that of the SSA as to which proposals should have been included in the re-evaluation process. See Ala. Aircraft, 2009 WL 3818528, at *3; E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

For all of these reasons, the court concludes that the decision of the SSA to re-evaluate certain proposals based on the significant discrepancies identified in the review process was not arbitrary or capricious and did not amount to an abuse of discretion.[7]

## C.   The Re-Evaluation Of GCC Was Rational

GCC also argues that the ***** ratings GCC received following the re-evaluation of its All State proposal were not rational. In re-evaluating GCC's All State proposal, the SSEB, consistent with the instructions it received from the SSA, focused upon GCC's teaming agreement *****. AR 1379-92. *****

Based on its review of the Administrative Record, the court finds that GCC's final ratings ***** are all rationally based. ***** The reason that GCC's reliance on its teaming partner's experience presented concern to the SSA was explained in the source selection memorandum, which states, "The contract contains a 30% self-performance requirement due to lessons learned in previous hurricane recovery missions where the prime contractors often did not have the capabilities to self-perform the mission

---

[7]Having sustained the decision to re-evaluate the proposals, the court has no occasion to consider GCC's objections to the SSEB's initial evaluation.

requirements and remedy deficiencies." AR 1301. The fact that GCC planned to self-perform 50% of the work under the contract is irrelevant when it is [GCC's subcontractor], rather than GCC, that holds all of GCC's technical capability. Thus, the weaknesses noted in the re-evaluation concerning GCC's extensive reliance upon [its subcontractor] to support GCC's proposal (AR 1379 -92) justified the ***** rating GCC received for both experience and capacity. Based on this record, the SSEB rationally concluded that a company relying so heavily on the expertise of its teaming partner did not merit [a higher] rating for experience-related technical factors.

Similarly, GCC's reliance on [its subcontractor] to support its compliance with the past experience section of its All State proposal justified the ***** rating that GCC received. GCC's proposal does not show that GCC itself had any past experience. GCC therefore has not demonstrated that in the SSEB's re-evaluation of the past experience requirement, the Board's decision to give GCC a top rating, but not the highest rating, was irrational.[8]

---

[8] GCC also argues that there is evidence in the record suggesting that the price estimates of various proposals may have been available to the All State SSEB prior to the re-evaluation of the three proposals and that this information may have prejudiced the evaluators. First, it is unclear from the record whether the SSEB did in fact have this price information before its re-evaluation. See AR 1061. Moreover, even if the evaluators did have this information, it does not render the re-evaluation arbitrary and capricious. Ordinarily when an agency intends to separately assess cost and technical proposals, "it has been common practice to withhold the cost information from technical personnel." Cibinic & Nash at 821. However, FAR 15.305(a)(4) provides that "[c]ost information may be provided to the evaluation team." FAR 15.305(a)(4), 48 C.F.R. 15.503(a)(4) (2008). As such, even assuming the SSEB members were aware of the prices offered in particular proposals, this fact alone is not enough to invalidate the re-evaluation procedure.

### D.  GCC Was Reasonably Excluded From The Technical/Price Tradeoff Process Because it Had the Fourth-Rated Technical Proposal

GCC contends that its proposal merited inclusion in the agency's best value determination process. It is well-settled that an agency's best value decision is entitled to considerable deference. Galen Med. Assocs., 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("as the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); Serco, Inc. v. United States, 81 Fed. Cl. 463, 496 (2008) ("a court must accord considerable deference to an agency's best-value decision in trading off price with other factors"). The technical/price tradeoff procedure outlined in the SSEP is triggered when "[t]he technical [sic] superior proposal has a higher price than the next best proposal, but seems worth the added expense" or when "[t]he technically superior proposal has considerably higher pricing than the next best offer, but does not seem worth the added cost." AR 53. The process described in the All State SSEP envisions examining only the technically superior proposal with the next best proposal. In this case, Ironclad's proposal was the former, and SDVA's was the latter. Consideration of other proposals in the technical/price trade-off was not contemplated. See id. Given this policy choice, GCC has failed to demonstrate how the SSA's decision not to include it in the technical/price tradeoff was improper or irrational. GCC has not demonstrated why, as the fourth-rated proposal, it should have been included in the trade-off analysis. In short, GCC, having failed to demonstrate why it should have received a higher technical rating, has likewise

18

failed to demonstrate that the SSA decision not to include GCC in the best value determination was irrational.[9]

### III. CONCLUSION

For the foregoing reasons, the government' motion for judgment on the administrative record is **GRANTED**. The plaintiff's motion for judgment on the administrative record is **DENIED**. The clerk is directed to enter judgment accordingly. Each party is to bear its own costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[9]GCC has no standing to challenge the merits of the SSA's trade-off analysis. It is well-settled that in order to challenge the merits of the selection decision the offeror must show that it was prejudiced by the decision. Labatt Food Serv., 577 F.3d at 1378 (disappointed bidder must show that "but for the error, it would have had a substantial chance of securing the contract"). For the reasons explained above, GCC cannot make that showing.